[Clohessy *v.* Roedelheim *et al.*]

OCTOBER AND NOVEMBER TERM, 1881, No. 76.

## Clohessy *versus* Roedelheim *et al.*

1. The act of March 29th, 1860, P. L., 346, was not intended to prevent every admixture of liquors, and the penalty of the act is aimed at such impurity, vitiation, or adulteration of liquors or admixtures thereof as impair either their quality or value.

2. The act forbids the introduction of all poisonous or noxious ingredients.

3. In order to establish a forfeiture of the right of vendors to recover the price of liquors sold, because of a violation of the local option law, it is not enough for the vendee to prove that an agreement or contract was made in the county in which that law is in force, but it is incumbent on him to prove a sale consummated by delivery in that county.

4. It is not error to refuse to affirm a point which improperly assumes as conceded a fact which is denied.

5. If a sale is actually made in one county, neither the manner in which the goods are consigned to the purchaser, nor the purpose for which they are thus consigned can possibly make another county the place of sale or delivery.

ERROR to the Court of Common Pleas, No. 1, of *Allegheny County.*

Assumpsit by S. Roedelheim, S. Bing, and H. Schloss, trading as Roedelheim, Bing & Co., against Michael Clohessy, to recover the price of certain liquors sold and delivered.

On the trial in the Court below, before COLLIER, J., counsel for plaintiff offered in evidence a note drawn by the defendant, dated April 6th, 1874, at six months, for $280, and a book account for orders filled between April 24th and Sep-

tember 18th, 1874, showing an unpaid balance of $197.40, amounting in all to $478.95.

Michael Clohessy, the defendant, testified in substance as follows:

I live in the borough of Irwin, Westmoreland County; I conduct a hotel there. The plaintiffs in this case used to be in the liquor business in Pittsburgh. I bought these goods in my own house in the borough of Irwin from Mr. Bing, a member of the firm, in the fore part of April, 1874. They were delivered about the 6th or 7th of April at Larimer Station in Westmoreland County. They were directed to 'R. B. & Co.,' Larimer Station, Westmoreland County. Plaintiffs afterwards sent a card authorizing the station master or agent to deliver the goods to the bearer of said card. They sent one of their business cards. Teamsters hauled the goods to my place at Irwin after night. I got some little goods afterwards, in September, 1874. Mr. Bing agreed with me, and he wrote in my ledger that he was going to send me Finch's golden wedding pure rye whiskey, made in the year 1869. A barrel of whiskey was shipped to me May 22d, 1874. They shipped several times to me with this card. I have one of the cards here.

(Witness produces it.)

"PITTSBURGH, May 22d, 1874.

" FREIGHT AGENT,
        " Irwin Station, Pa.

"DEAR SIR: Please deliver unto bearer one barrel and one box glassware, marked R. & B., at your station, and oblige,
        " Yours,          ROEDELHEIM, BING & Co."

The bargain or sale for the May shipments was closed at my place with Mr. Bing. Mr. Bing guaranteed that he would give me pure liquor. He was to give me some Freeport whiskey and some of Finch's golden wedding, and some other different brands of liquors. I came into Pittsburgh a few days afterwards and met a neighbor of mine in Irwin. I took him down. Mr. Bing wrote me out a written guarantee in the presence of my friend. The firm signed it. He guaranteed to give me pure rye whiskey. He guaranteed to give me everything pure; everything would be as he represented it; and he wrote me out this guarantee, and I forgot to lift it. Two or three weeks afterwards I went in to him and told him the people were complaining of the goods, and that they were not, I thought, as he told me they would be. I told him that the whiskey was not as old as he represented it; the stamps showed so. I told him the goods wasn't as he represented them to be, and I couldn't make use of them.

[*Clohessy v.* Roedelheim *et al.*]

I didn't get the kind of whiskey and liquors I bargained for; the people wouldn't pay me anything for it. I offered two or three times to send it back. They didn't accept my offers. They told me they would make it all right with me, and guarantee I never would lose anything. It wasn't pure rye whiskey; it didn't come up to the guarantee, and had an offensive taste. I employed Francis C. Phillips, professor in the Western University, to examine these liquors. I got bottles, filled them out of barrels of liquors that I got from this firm that I had on hand. Another man and me, as soon as we filled them, fetched them here and gave them to Mr. Phillips. I bought no liquors from anybody else than the plaintiffs. All the liquors that I sold came from the firm of Roedelheim, Bing & Co. No one about my establishment put water or sugar or any other adulteration in any of these liquors.

Upon cross-examination he testified:

These April goods were shipped to Larimer Station, in the name of R., B. & Co., over the Pennsylvania road. Mr. Bing requested that the goods be marked R., B. & Co. I told Mr. Bing I didn't want to get the goods at all; that I was afraid of being returned for selling them; and he told me he would ship the goods in the name of the firm, and he would guarantee it would never cost me one dollar the selling of it. He said he had an attorney in Greensburgh, and if I would get into any trouble he would see me out of it. I never knowed anything about the card; they planned it all out themselves.

Ten other witnesses testified that they were customers of the defendant, drank liquors at his bar, and that these liquors had a bad taste and smell.

F. C. Phillips, for the defendant, testified that he was professor of chemistry in the Western University for five years; that he had received samples of liquors from Clohessy November 17th, 1876, and made an analysis of them; that the Freeport whiskey had a peculiar disagreeable taste, contained acetic acid, and, as an adulteration, a considerable quantity of a bitter substance, which he believed to be hop bitters; that the Monongahela whiskey contained a small quantity of burnt sugar, and had an offensive, mouldy, or smoky taste; that the gin contained a moderate amount of sugar and oil of juniper, and sediment was muddy and acid; and that he believed it to consist of gin, with a notable quantity of sour wine; that the port wine contained a considerable quantity of sediment, sulphuric acid, acetic acid, and a considerable quantity of sugar; that the family rye and Jamaica rum contained no impurities; and that the brandy was very

acid, and contained sediment, sour wine, and, as an adultera-
tion, a bitter extract.    There was no poisonous admixture.

Counsel for defendant then proved that the county of
Westmoreland voted against license March 21st, 1873; and
that the local option law was in force in that county at
the time of these sales.

Samuel Bing, one of the plaintiffs, testified in rebuttal in
substance:

Clohessy bought those goods, in April, 1874, as he bought
all his other goods,—by inspection,—by coming to our store
after I solicited him to come there,—requested him to come.
We showed him the goods.   He inspected them.   We told
him the age of the goods.   If he found them satisfactory
he would buy them, and if not he would pass them by.   We
gave no guarantee; we never give any guarantee.   Every
man that is in the whiskey business knows what Freeport
whiskey is.   We sold it as Freeport.   He tasted the port
wine, the rum, and the gin.   I know nothing at all about a
written guarantee.   I was never requested to give one.   We
had a special arrangement with Mr. Clohessy to ship his
goods with our initials on,—R. & B.,—as he didn't want to
receive the goods in his own name during local option time
in Westmoreland County.   The goods were shipped from
our store in Pittsburgh by the Pennsylvania railroad.   We
delivered the card giving the railroad company the right to
deliver the goods to the bearer to Mr. Clohessy.   At his re-
quest we would write out the card, directing the station
agent at Irwin to deliver these goods to the bearer.   That
card, of course, we gave to Mr. Clohessy; who he gave that
card to to get his goods we don't know.   It was Mr. Clo-
hessy's arrangement; we would not make no such arrange-
ment with anybody else.   The freight was paid by Mr. Clo-
hessy, to the best of my knowledge; we never paid any
freight.   Those goods were ordered in our store by Mr. Clo-
hessy.

Upon cross-examination, the witness said:

I never took any order from him at Irwin.   After sell-
ing the goods we had a standing rule with Mr. Clohessy.
He didn't want to be known as receiving the goods in
his own name, and he requested us to mark the goods
R. & B., give him the card to allow him to go there him-
self or send there whoever he pleased, and the freight
agent would give those goods to the bearer of the card.   If
we didn't give the card to him directly, we mailed it.   That
card authorized the railroad company to deliver the goods
at the station to which they were shipped in Westmoreland
County.   Mr. Clohessy requested us to ship them that way

[Clohessy *v.* Roedelheim *et al.*]

for the reason stated,—that he didn't want to be known. He wanted to guard against the local option law. He didn't want to be known as receiving goods in his own name.

The testimony of Sigmund Roedelheim and Herman Schloss, the other plaintiffs, was to the same effect.

Counsel for plaintiffs asked the Court to charge the jury upon the following points, *inter alia :*

8. That if the jury believe that at the time of shipment of the goods, a card or written order was delivered personally to defendant or mailed to him, which card directed the railroad company to hand over the goods sued for herein, to defendant or bearer, and that such card or order was so delivered or mailed by direction of defendant, then the instant such card was so delivered or mailed at Pittsburgh the title to said goods passed out of plaintiffs, and vested at once in Clohessy, the defendant, and the sale was in law a sale made at Pittsburgh, and was not in violation of the local option law of Westmoreland County.

9. That if the jury believe that the goods sued for herein were marked " R. & B." by special order of Clohessy, the defendant, and that defendant paid the freight thereon, the sale was not completed till delivered to the common carrier at Pittsburgh, but that when so delivered the title was instantly vested by law in the defendant, Clohessy.

The Court affirmed these points and defendant excepted.

Counsel for defendant asked the Court to charge upon the following points, *inter alia,* which points and answers were:

2. That any impurity, vitiation, or adulteration to the least extent would fall within the meaning of the law which prohibits a recovery for such liquors. Therefore, if the jury find from the evidence that there was the least impurity, vitiation, or adulteration, their verdict should be for the defendant.

*Answer.* If the jury believe that there was any impurity, vitiation, or adulteration which impaired the quality or value of any of the liquors in suit to the least extent, the plaintiffs cannot recover for the liquors so impaired.

3. That the term impure means the introduction of any substance foreign to and not essential in the manufacture of pure liquors. Therefore, if the jury find that the liquors sued for contained any impurity, the plaintiffs cannot recover.

*Answer.* Refused.

5. That if the jury find that the contract of sale and purchase was made in the county of Westmoreland while the local option law, which prohibited the sale of intoxicating liquors in that county, was in force, and in violation thereof, the plaintiffs cannot recover.

*Answer.* Refused.

7. That if the jury believe the testimony of the plaintiffs themselves, that the liquors were shipped in their own names to Larimer, or any other point in the county of Westmoreland, and that the goods were there delivered to the defendant in violation of the local option law then in force, the plaintiff cannot recover.

*Answer.* Refused. The plaintiffs expressly deny that they delivered the goods to the defendant in Westmoreland County.

8. That if the jury find, from the facts as stated by the plaintiffs, that the liquors were shipped to any point within the county of Westmoreland in the plaintiffs' names, and that the plaintiffs authorized the delivery to defendant, in the county of Westmoreland, at the request of defendant, to knowingly aid him to evade the prohibitory law then in force in that county, then, and in such case, the plaintiffs cannot recover in this action.

*Answer.* Refused.

9. That if the jury find from the evidence that the plaintiffs, in the sale and delivery of the liquors sued for, knowingly aided and abetted the defendant in any way to evade or violate the liquor law then in force in the county of Westmoreland, then, and in such case, the plaintiffs cannot recover.

*Answer.* Refused.

Counsel for defendant excepted to these answers.

The Court charged the jury generally that if they believed there was a delivery in Westmoreland County, or an agreement to deliver there, they should find for the defendant; that it was for them to determine whether any of the liquors were impure, vitiated, or adulterated in the least degree, so as to impair their quality or value, and if they were, plaintiffs could not recover for the liquors in that condition; that if all were in that condition they could not recover anything, and if only a part were so they could not recover for that part; and that if there was a guarantee defendant could stand upon it, and if the goods were not as represented, the plaintiffs could not recover.

January 21st, 1881, verdict for the plaintiffs for $272, upon which judgment was entered.

Defendant then took out a writ of error, assigning as his first, second, third, fourth, fifth, and sixth grounds of error the answers to the defendant's 2, 3, 5, 7, 8, and 9 points, and as his seventh and eighth grounds of error the answers to plaintiffs 8 and 9 points as above.

[Clohessy *v.* Roedelheim *et al.*]

*Weir & Gibson* and *C. F. McKenna* for plaintiff in error.

It was an erroneous interpretation of the act of March 29th, 1860, to instruct the jury that the liquors might be impure or adulterated in such a way as would not impair their value or quality, and if so plaintiffs could recover. The act declares that proof of impurity, vitiation, or adulteration shall be a good and legal defence.

The plaintiffs made an arrangement with Clohessy for the purpose of shielding him from the penalties of the local option law he was violating. If the contract of sale and delivery were in violation of the statute which prohibited such sale and delivery, the Court will not aid the plaintiffs to enforce it.

If the plaintiffs knowingly aided and abetted the defendant, or conspired with him to violate the law in the sale and delivery of the liquors, the Court will not assist them to realize the fruits of their wrong: United States *v.* Owens, 2 Peters, 538 ; Coppell *v.* Hall, 7 Wall., 558 ; Bank *v.* Lanier, 11 Wall., 369 ; Bank of Augusta *v.* Earle, 13 Peters, 587 ; Mitchell *v.* Smith, 1 Binney, 110 ; Seidenbender *v.* Charles's Administrator, 4 S. & R., 151 ; Biddis *v.* James, 6 Binney, 329 ; Maybin *v.* Coulon, 4 Dallas, 298 ; Duncan *v.* McLure, 4 Ibid., 308 ; Badgly *v.* Beale, 3 Watts, 263 ; Kepner *v.* Keefer, 6 Ibid., 231 ; Wagonseller *v.* Snyder, 7 Ibid., 343 ; Clippinger *v.* Hepbaugh, 5 W. & S., 315 ; Filson *v.* Himes, 5 Barr, 452 ; Columbia Bank and Bridge Co. *v.* Haldeman, 7 W. & S., 233 ; App. *v.* Coryell, 3 Penna. R., 494 ; Edgell *v.* McLaughlin, 6 Wh., 176 ; Brua's Appeal, 5 P. F. Smith, 295 ; Fowler *v.* Scully, 22 Ibid., 456 ; Stephens *v.* Monongahela National Bank, 7 Norris, 157.

*Josiah Cohen* for defendant in error.

The place of delivery is the place of sale : Garbracht *v.* The Commonwealth, 28 Pittsburgh Leg. Journal, 220 ; 2 Parsons on Contracts, 586 ; Shriver *et al. v.* Pittsburgh, 16 P. F. Smith, 446 ; Finch *v.* Mansfield, 97 Mass., 89.

The true object of the act of Assembly invoked by plaintiff in error was not to prevent the admixture of liquors, for by its terms admixtures were recognized, but to prevent such admixtures from being impure, vitiated, or adulterated.

The opinion of the Court was delivered, November 14th, 1881, by STERRETT, J.

One of the several defences, made in the Court below, was grounded on the act of 29th of March, 1860, which, *inter alia*, provides that, " in all actions for the sale of any spirituous, vinous, or malt liquors, or any admixtures thereof,

[Clohessy *v.* Roedelheim *et al.*]

it shall be competent for the defendant, in every such case, to prove that said liquors or admixtures thereof were impure, vitiated, or adulterated; and, proof thereof being made, shall amount to a good and legal defence to the whole of the plaintiffs' demand:" Purdon, 949, Pl. 61.

Testimony was introduced by the defendant below tending to prove that at least some of the liquors purchased from the plaintiffs were of the character described in the act; and, in the two points covered by the first and second assignments of error respectively, the Court was requested to charge: 1st. " That any impurity, vitiation, or adulteration, to the least extent, would fall within the meaning of the law which prohibits a recovery for such liquors; therefore, if the jury find from the evidence that there was the least impurity, vitiation, or adulteration, their verdict should be for the defendant." 2d. " That the term impure means the introduction of any substance foreign to and not essential in the manufacture of pure liquors. Therefore, if the jury find that the liquors sued for contained any impurity, the plaintiffs cannot recover." The latter proposition was refused; and, in answer to the first, the learned judge instructed the jury that if they believed " there was any impurity, vitiation, or adulteration which impaired the quality or value of any of the liquors in suit to the least extent, the plaintiffs cannot recover for the liquors so impaired." In view of the mischief intended to be remedied by the act, we think the construction given to it in the foregoing answer, in connection with the general charge, is entirely proper. The act was not intended to prevent every admixture of liquors, for by its very terms " admixtures thereof" are recognized. The penalty of the act is aimed at such impurity, vitiation, or adulteration of liquors or admixtures thereof as impaired either their quality or value. This, of course, forbids the introduction of all poisonous or noxious ingredients, because these necessarily impair the quality, if not also the value of the liquor. The amount found by the jury, as compared with the plaintiffs' demand, indicate that, under this branch of the defence, part of their claim was excluded by the jury.

Another ground of defence was, that the liquors were sold and delivered by plaintiffs to defendant in Westmoreland County in violation of the local option law then in force in that county. On that subject the testimony was somewhat conflicting, and it was, therefore, a question of fact for the jury, whether the sale was consummated by delivery in Allegheny or in Westmoreland County. That question was fairly submitted with proper instructions as to what constituted a sale, and the jury were told that if they believed the

[Clohessy *v.* Roedelheim *et al.*]

liquors were sold in Westmoreland County their verdict should be for the defendant. In addition to the instructions thus given in the general charge, two of the plaintiffs' propositions, complained of in the last two assignments, were affirmed. In each of these an important phase of the question, as suggested by the testimony, was clearly and correctly presented, and there was no error in affirming them. The verdict, rendered under the full and explicit instructions thus given in the general charge, and in answer to the plaintiffs' eighth and ninth points above referred to, establishes the fact that the sale was made in Allegheny County, where the local option law was not in force.

The third assignment is not sustained. It was not enough for defendant to show that an agreement or contract to sell was made in Westmoreland County. Before he could claim that plaintiffs had forfeited their right to recover the price of their goods, in consequence of having sold them in Westmoreland County contrary to law, it was incumbent on him to prove a sale consummated by delivery in that county,— such a sale as would render them amenable to indictment there. As already observed, the instructions on this subject were clear and adequate. The point, as presented, was rightly refused: Garbracht *v.* Commonwealth, 28 P. L. J., 220.

For the reason given by the learned judge, there was no error in refusing to affirm the point specified in the fourth assignment. It improperly assumed, as a conceded fact, that the liquors were delivered by the plaintiffs below in Westmoreland County. This they expressly denied, and it thus became one of the main questions of fact for the jury.

The fifth and sixth assignments are not sustained. The propositions recited therein, and which the Court refused to affirm, are based on the testimony as to an understanding between the parties, in pursuance of which the goods, purchased by defendant below, were marked "R. & B.," and shipped to Westmoreland County, so that his name would not appear as consignee, etc. If the sale was actually made in Pittsburgh, neither the manner in which the goods were consigned to the purchaser, nor the purpose for which they were thus consigned could possibly change the place of sale and delivery. Assuming it to be true that they were marked and shipped in the manner and for the purpose testified to by the defendant below, the plaintiffs, in so doing, violated no law. If they sold and delivered the liquors to him at Pittsburgh, as the jury found, they had an undoubted right to mark and ship them to him in any manner he might direct. To hold that by so doing they knowingly aided him

[Linton *v.* Vogle.]

to evade or violate the liquor law then in force in West-moreland County, would be wholly unwarranted. Aside from the defence based on the act of 1860, the only question that could legitimately arise on the evidence in the case was whether the sale was consummated by delivery in Allegheny or in Westmoreland County. That question, as we have seen, was fairly submitted to the jury and found in favor of the plaintiffs below

Judgment affirmed.